Amy **ROWLEY, by her parents and natural guardians, Clifford and Nancy Rowley, and Clifford and Nancy Rowley, in their own right, Plaintiffs,**

v.

The **BOARD OF EDUCATION OF The HENDRICK HUDSON CENTRAL SCHOOL DISTRICT, WESTCHESTER COUNTY, and the Commissioner of Education of the State of New York, Defendants.**

**No. 79 Civ. 2139 (VLB).**

United States District Court, S. D. New York.

Jan. 15, 1980.

See also, D.C., 483 F.Supp. 536.

Michael A. Chatoff, Jamaica, N.Y., for plaintiffs.

Kuntz, Lewis & Spletzer, P.C., Poughkeepsie, N.Y., by Raymond G. Kuntz, Poughkeepsie, N.Y., for defendant School Dist.

Robert D. Stone, Albany, N.Y., by Paul E. Sherman, Jr., Albany, N.Y., for defendant Gordon M. Ambach.

## OPINION

VINCENT L. BRODERICK, District Judge.

### I.

Eight-year old Amy Rowley and her parents have brought this action under The Education for all Handicapped Children Act of 1975 ("the Act"), 20 U.S.C. § 1401 *et seq.*, to review the decision of the New York State Commissioner of Education upholding the denial by the board of education of the Hendrick Hudson Central School District of their request that Amy, who is deaf, be provided with the services of a sign language interpreter in the classroom.[1] A hearing was held before this court on September 26, 27, 28 and October 4, 1979 on plaintiffs' motion for a preliminary injunction. At the conclusion of the hearing the parties stipulated that the hearing would take the place of a trial on the merits. I issued an order dated December 28, 1979 directing that a sign language interpreter be provided for Amy. This opinion contains my findings of fact and conclusions of law under Rule 52(a), Fed.R.Civ.P.

The central issue is whether the refusal to provide Amy with a sign language interpreter in the classroom, made by the school district and sustained by the commissioner, deprives her of the "appropriate education" required by law. For the reasons which follow, I find that the plaintiffs have established by a preponderance of the evidence Amy's right to a sign language interpreter in the classroom.

### II.

The following constitute my findings of fact in this case:

Amy Rowley is a deaf child and therefore "handicapped" within the meaning of the Act. Like most deaf individuals, she has some residual hearing. Amy's residual hearing is particularly good in the lower frequencies, where vowel sounds are distinguished. Since vowel sounds are particularly hard to lipread, this gives her a substantial advantage over deaf children who do not have the same residual hearing.

Amy's parents are both deaf. Since the time that they discovered her deafness, not

---

1. The suit was originally brought against the school board, but the Commissioner of Education was thereafter joined as a necessary party.

long after she was born, they have raised Amy with the use of total communication. "Total communication" is a relatively new system of deaf education which entails the flexible use of a wide range of communication methods—mouthing words, amplification, signing, touching, and visual cues. Its hallmark is its emphasis on communicating with a deaf person by simultaneously mouthing words and signing them. Total communication has gained increasing acceptance among deaf educators since the release of studies indicating that deaf children raised in deaf households where total communication is used fare better academically and emotionally than other deaf children.

Amy's parents, concerned with helping her accommodate to her handicap, and with her total intellectual and emotional well-being, trained her as a very young child in receptive and communicative techniques. Largely as a result of their work with her, Amy entered school with a much better ability to communicate and receive information and to establish social contact than most deaf children. At present, in the second grade, she is an excellent lipreader and uses amplification to make optimal use of her residual hearing. Amy's mother spends at least one hour a day going over school work with her. In addition, Amy's tutor for the deaf, who spends one hour with her each day, prepares her for upcoming classes so that she can participate with a slight advantage over the other students.

In the year before Amy was due to enter kindergarten, her parents approached the administrators of the Furnace Woods School, a public school where their son, a child with normal hearing, was already enrolled, to alert them to her hearing handicap. The principal of the school, Joseph Zavarella, and the other school administrators and teachers involved in Amy's case responded very constructively to the challenge they faced. A number of them took a mini-course in sign language interpretation.

A teletype phone was installed in the principal's office to facilitate communication with the Rowleys at home. They conferred with Amy's parents to work out a program for Amy.

According to an agreement reached between the Rowleys and the school, Amy's kindergarten year began with a data-gathering trial period during which she was placed in a regular kindergarten class without any support services. At the end of the trial period it was decided to provide her with an FM wireless hearing aid.

In February of the kindergarten year a sign language interpreter, Jack Janik, was placed in Amy's class full-time for a two-week trial period. At the end of that period, Mr. Janik submitted a report which concluded that Amy did not need his services for that kindergarten class. His conclusion was based on the extraordinary sensitivity of Amy's kindergarten teacher to her needs and on Amy's resistance to the interpretive services. It is clear from the report, however, and from a subsequent affidavit filed by Mr. Janik in connection with these proceedings, that his recommendation was strictly limited to the particular class for which he had rendered the service, and did not rule out the necessity of interpretation in other classes or in subsequent academic years.

Federal law requires that an individualized education program ("IEP") be established or revised annually for every handicapped child, 20 U.S.C. § 1414(a)(5), and that the parents of the child participate in the development of such a plan, 20 U.S.C. § 1401(19). In the fall of Amy's first grade year, the school district set out to draw up such a plan.[2] The first stage in that process was to obtain a recommendation from the school district's Committee on the Handicapped ("COH").[3] The COH received expert evidence offered by the Rowleys to the effect that the services of a sign language interpreter are important in the education

2. An IEP had been developed for Amy in her kindergarten year with which her parents had concurred.

3. The COH is made up of a psychologist, an educator, a physician and the parent of a handicapped child.

of a deaf child, visited a class for the deaf, and heard testimony from school teachers and other personnel familiar with Amy regarding her academic and social progress. The COH recommended that Amy be provided with: a) continued use of the FM wireless hearing aid; b) the services of a tutor for the deaf for one class hour every day; and c) the services of a speech therapist for three hour-long sessions per week. The COH concluded that Amy did not need the services of an interpreter at that time.

That recommendation was forwarded to the Furnace Woods School where it was incorporated in the IEP being drafted by Amy's teacher. Amy's teacher never met or conferred with the Rowleys in developing the draft IEP. The balance of the IEP contained a summary of Amy's academic progress and a statement of academic goals.

On December 6, 1978, school personnel met with Amy's parents to discuss the draft IEP. The Rowleys concurred with the program in all respects but one: they insisted that their daughter needed the services of a sign language interpreter for her academic classes. The IEP was sent back to the COH for review. The COH stood by its earlier recommendation that interpretive services not be provided.

The Rowleys demanded and received a hearing before an independent examiner on their objection to the IEP. When the examiner rendered a decision against them, they appealed that decision to the Commissioner of Education. Upon receiving the commissioner's decision upholding the independent examiner, they brought this civil action.

Amy received the support services recommended by the COH and provided for in the IEP throughout first grade and continues to receive them now. The Rowleys' only quarrel with the defendants remains the failure to provide interpretive services for their child.

Amy Rowley, who is now in the second grade,[4] is a remarkably well-adjusted child. She interacts with her classmates fairly well, and can communicate with them. They are aware of and have learned how to adjust to her handicap when communicating with her.[5] She is able to help her classmates with school assignments, and is occasionally called on by the teacher to do so.

Amy's interaction with her teachers has been even more successful than her interaction with her peers. All her teachers have been sensitive to her handicap and have made efforts to accommodate their teaching methods to it as much as possible by using the FM wireless, by speaking clearly for her, and by using visual cues. She usually responds accurately to the teacher's instructions and notifies the teacher from time to time if she has missed something. Amy and her teachers have developed an extraordinary rapport; since she is a bright and eager child, they have demonstrated great respect for her and have given her special responsibilities.

4.  · Procedurally, this case is before me in a rather awkward posture. Technically, this court has jurisdiction to review only the IEP developed for the 1978–79 school year, which has long since passed. A motion was made to dismiss for lack of jurisdiction on that ground, which has been discussed and denied in a memorandum order filed simultaneously with this opinion. Since administrative remedies have not yet been exhausted with regard to the 1979–80 IEP, that IEP is not on review here now. In spite of the limited scope of my review, however, evidence concerning Amy's current status is relevant to my determination of the "appropriateness" of injunctive relief at this stage. *See* 20 U.S.C. § 1415(e)(2). For that reason many of my findings relate to the present as well as to the past school year.

5.  Plaintiffs and defendants have offered conflicting evidence on the issue of Amy's social interaction in class. The plaintiff has submitted affidavits by expert observers which note that she seems somewhat isolated and makes herself understood to the other children only about 50% of the time. The defendants' witnesses testified that she communicates quite freely and well with her classmates. Since the evidence offered by the defendants on this issue was current while that offered by the plaintiffs was over 6 months old, I have found that Amy communicates or interacts fairly well with her classmates. There is no evidence, however, to suggest that her interaction is any more than superficial.

The plaintiffs submitted the results of a variety of auditory speech discrimination tests performed on Amy over the course of a couple of years. These tests measure a deaf child's ability to identify words which are spoken to her.[6] On the basis of these tests, I find that by making use of her hearing aids and her lipreading skills, which she would be doing under ideal classroom conditions, Amy can identify 59% of the words which are spoken to her. With the use of "total communication" she can identify 100% of the words spoken to her.

Words spoken by a familiar speaker in a familiar context are, of course, easier to identify than words spoken under test conditions. Amy's discrimination level might on that basis be assumed to be higher than 59% in a classroom situation. Classroom conditions, however, do not often approach the ideal conditions of the testing room. Amy is likely to hear a great deal less when there is noise in the classroom, when more than one person speaks at one time, when the backs of speakers are turned to her or films are being shown. Accordingly, I find that Amy is capable of discriminating considerably less than 100% of what is spoken in class—probably in the neighborhood of 59%.

The defendants introduced results of academic achievement tests Amy had taken in her first grade. Amy's scores on the Metropolitan Achievement Test were about average for her class, and her scores on the Stanford Achievement Test which was administered to her in sign language, were well above average.[7] Amy's school records establish that she is performing above the median for her class. She has an IQ of 122.

Taken as a whole, this information establishes that Amy is a very bright child who is doing fairly well in school. It also establishes that she understands considerably less of what goes on in class than she could if she were not deaf. Thus she is not learning as much, or performing as well academically, as she would without her handicap.

The parties introduced conflicting evidence regarding the importance of an interpreter in the early years. While I accept the defendants' evidence that an interpreter is less necessary for the transmission of mechanical skills in the early grades than for the increasingly academic instruction of higher grades, I also find that anything

---

6. Amy has submitted to at least two such tests, one of which was administered on several occasions. The tests are very similar in format: A word is spoken to the deaf child and she must match it to one of four pictures in the test booklet before her. The tests were administered to Amy under a variety of conditions. Their results can be summarized as follows:

*Word Identification by Picture Intelligibility Test* ("WIPI")
With hearing aids only: 80%
*Goldman—Fristoe—Woodcock Test* ("GFW")
With hearing aids only: 43%
Noise subtest: 27%
With hearing aids and lipreading: 59%
With hearing aids and lipreading repeated: 84%
With total communication: 100%

I find that 59%, on the GFW test, is the most relevant test score. WIPI tests had apparently been administered to Amy on a number of occasions before the results recorded above were obtained—so numerous that she became quite familiar with it. The tests during which she was allowed both to lipread and to use her hearing aids best simulated classroom conditions. The same GFW test was administered twice on the same occasion with hearing aids and lipreading. The first of them, administered when the test was still new to her, would seem to reflect her speech discrimination ability more accurately than the repeated test.

7. Specifically, her scores on the Metropolitan Achievement Test were:

| | | Grade Equivalent | Percentile |
|---|---|---|---|
| 1. | Word knowledge | 2.5 | 86 |
| 2. | Word analysis | 2.2 | 84 |
| 3. | Reading | 2.1 | 78 |
| 1 + 3 total reading | | 2.2 | 78 |
| 4. | Total math | 2.1 | 62 |

These scores were about average for her class. Her scores on the Stanford Achievement Test were:

| | | Grade Equivalent |
|---|---|---|
| 1. | Vocabulary | 3.3 |
| 2. | Reading | |
| | Part A | 1.9 |
| | Part B | 3.5 |
| 3. | Math concepts | 4.0 |
| 4. | Math computation | 4.5 |
| 5. | Listening comp. | 5.7 |

missed in the classroom early in the learning process will have far reaching consequences.

The parties were also in conflict regarding the potential for disruption of an interpreter in the classroom. I find that the plaintiffs have established that an interpreter could be integrated into the classroom in a way which will not disrupt the class or adversely affect Amy's social interaction.

## III.

The Act requires that every state receiving federal educational assistance have in effect a policy "that assures all handicapped children the right to a free appropriate public education." *Id.* at 1412. The Act itself does not define "appropriate education." The regulations promulgated thereunder supply a functional explanation:

(b) Appropriate education. (1) For the purpose of this subpart, the provision of an appropriate education is the provision of regular or special education and related aids and services that (i) are *designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met*

and (ii) are based upon adherence to procedures that satisfy the requirements of §§ 84.34, 84.35, and 84.36. 45 CFR § 84.33(b) (emphasis supplied).

In addition, the Act itself provides two guidelines. The first, a procedural guideline already referred to (*see* page 531, *supra*), requires that an individualized education program be developed for every handicapped child at a meeting with the child's parents and educators, 20 U.S.C. § 1414(a)(5), 1401(19).[8] The second expresses a strong preference for "mainstreaming" handicapped children; it provides that they are to be educated with non-handicapped children to the "maximum extent appropriate." 20 U.S.C. § 1412(5)(B).[9]

Aside from the HEW regulation quoted above, it has been left entirely to the courts and the hearing officers to give content to the requirement of an "appropriate education." While in future years a "common law" will undoubtedly evolve out of the Act to provide guidance for subsequent judicial decision-making, it is much too early yet to find it. Enforcing the Right to an Appropriate Education: The Education for All Handicapped Children Act of 1975, 92 Harv. L.Rev. 1103, 1125–27 (1979) (hereinafter, "Appropriate Education").

---

**8.** § 1414. Application
 (a) A local educational agency or an intermediate educational unit which desires to receive payments under section 1411(d) of this title for any fiscal year shall submit an application to the appropriate State educational agency. Such application shall—
 \* \* \* \* \* \*
 (5) provide assurances that the local educational agency or intermediate educational unit will establish, or revise, whichever is appropriate, an individualized education program for each handicapped child at the beginning of each school year and will then review and, if appropriate revise, its provisions periodically, but not less than annually;
 § 1401. Definitions
 \* \* \* \* \* \*
 (19) The term "individualized education program" means a written statement for each handicapped child developed in any meeting by a representative of the local educational agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of handicapped children, the teacher, the parents or

guardian of such child, and, whenever appropriate, such child, . . .
 Plaintiffs have contended that the school board failed to comply with these procedural requirements in developing the IEP. In light of my disposition of this case on the merits, I find it unnecessary to reach that issue.

**9.** § 1412. Eligibility requirements
 In order to qualify for assistance under this subchapter in any fiscal year, a State shall demonstrate to the Commissioner that the following conditions are met:
 (5) The State has established . . . (B) procedures to assure that, to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily, . . .

■ An "appropriate education" could mean an "adequate" education—that is, an education substantial enough to facilitate a child's progress from one grade to another and to enable him or her to earn a high school diploma. An "appropriate education" could also mean one which enables the handicapped child to achieve his or her full potential. Between those two extremes, however, is a standard which I conclude is more in keeping with the regulations, with the Equal Protection decisions which motivated the passage of the Act, and with common sense. This standard would require that each handicapped child be given an opportunity to achieve his full potential commensurate with the opportunity provided to other children. *Appropriate Education, supra* at 1125–26. Since some handicapped children will undoubtedly have the intellectual ability to do better than merely progress from grade to grade, this standard requires something more than the "adequate" education described above. On the other hand, since even the best public schools lack the resources to enable every child to achieve his full potential, the standard would not require them to go so far.

The difficulty with the standard, of course, is that it depends on a number of different measurements which are difficult to make. It requires that the potential of the handicapped child be measured and compared to his or her performance, and that the resulting differential or "shortfall" be compared to the shortfall experienced by non-handicapped children.

In an attempt to establish that they have met the standard, defendants have relied on measurements of Amy's academic performance and descriptions of her behavior. The Committee on the Handicapped based its recommendation on the testimony of Amy's teachers and others who had observed her academic and social performance. The committee rejected as "one-sided" the expert opinions offered by the Rowleys concerning the impact on a deaf child's comprehension of various forms of communication. Amy's principal, Dr. Zavarella, who was ultimately responsible for the preparation of the IEP, testified, before the hearing officer and before me, that only her academic failure would convince the school district that she needed the services of an interpreter. Before me the school board relied heavily on the observations of Amy made by her own teachers and by deaf educators who were dispatched to the classroom for the purpose of making such observations. In finding that Amy is a bright, well-adjusted child who has enjoyed a fine rapport with all of her teachers and is able to respond to their instructions, I have accepted virtually all of that testimony as true.

■ While this evidence firmly establishes that Amy is receiving an "adequate" education, since she performs better than the average child in her class and is advancing easily from grade to grade, it establishes little more. I find that the defendants' emphasis on her academic performance and the suggestion that only academic deficiencies would induce them to provide Amy with an interpreter are based on an erroneous understanding of the law; they ignore the importance of comparing her performance to that of non-handicapped students of similar intellectual calibre and comparable energy and initiative.

The defendants have tried to repair the deficiency in their presentation by arguing in their post-trial brief that Amy's performance on the Stanford Achievement Test, which was well above average, shows that she is measuring up to the potential reflected in her IQ score of 122. If accurate, this is precisely the kind of information which would be most relevant to my decision in this case. The argument, however, is not supported by any evidence the defendants offered. The most direct support it received is a statement by one of the plaintiffs' witnesses, Dr. Donald Moores, to the effect that the Stanford Achievement Test score was probably a better indication of Amy's potential than the somewhat lower Metropolitan Achievement Test score. This is hardly persuasive support for the proposition that Amy's scores establish that she is learning all she would be learning if she were not deaf.

Moreover, Amy's IQ does not represent the full measure of her potential. The defendants' own witnesses have established by their testimony Amy's energy, her intellectual assertiveness, her rapport with her teachers and her interest in learning. These are significant elements of her potential which are not reflected in her IQ but which are undoubtedly reflected in the results of her achievement and other academic tests. It seems likely that much of Amy's energy and eagerness goes into compensating for her handicap; if the need for some of that compensation were eliminated, her energy could be channeled into greater excellence in classroom performance. It is unfair and contrary to law to penalize her for her own efforts and those of her parents, by which she has remained slightly above the median of her class.

The plaintiffs did not attempt to pursue this line of proof. They did, however, supply circumstantial evidence of deficiencies in Amy's education: evidence that Amy is capable of discriminating much less than 100% of what is said in class. The inevitable inference from that evidence is that she is understanding much less than 100%. While speech discrimination and understanding are not coterminous functions, the latter is clearly impossible without the former. That deficiency in Amy's understanding supports the conclusion that her educational shortfall is greater than that of her peers. While it is true, as defendants contend, that no child understands 100% of what is taught in class, the failures of other children can be attributed either to lack of intellectual potential, in which case there is no shortfall relevant to the standard described above, or to a lack of interest or energy, factors which can be controlled and which it is the purpose of a school to develop. Amy's lack of understanding, by contrast, is inherent in her handicap and is precisely the kind of deficiency which the Act addresses in requiring that every handicapped child be given an appropriate education.

In a different vein, the testimony and affidavits of the plaintiffs' experts concerning the superiority of total communication as a tool of education lent support to the inferences drawn from the word discrimination test results. The defendants have contended that no expert testimony which is not based on observations of Amy and which does not express opinions about her education specifically has any relevance to the appropriateness of that education. The testimony of the plaintiffs' experts, however, was clearly applicable to Amy. Two of the affidavits submitted were from experts who had actually observed Amy in class and were able to express opinions concerning her education specifically. (*See* affidavits of Michael Deninger and Mary Sheie.) All of the other experts testified that *every* deaf child fares better in class with an interpreter. "Every" deaf child includes Amy Rowley.

While it is true that the law requires that the needs of each individual handicapped child be assessed, and in keeping with that goal eschews any general formulations or guidelines, as a practical matter those needs cannot be assessed without reference to generally accepted methods of special education for the handicapped. *Appropriate Education, supra* at 1127. Ideally, we would examine Amy Rowley in isolation and determine the services needed to bring her educational opportunity up to the level of the educational opportunity being offered to her non-handicapped peers. Given the difficulty of making such an assessment, however, it is useful to consider Amy as a member of a class of similarly handicapped children, a class about which a good deal of useful information is available. The plaintiffs' experts established by their testimony, which was in this respect largely uncontradicted, that there is a marked trend towards the use of total communication in the education of the deaf—a trend supported by studies showing the greater degree of success of students brought up in deaf households using total communication. If there is something unique about Amy's situation which renders these generalizations less applicable to her, it is a uniqueness occasioned in large measure by her

superior intellectual and personal abilities, for which she should not be penalized.[10]

Having found that Amy's academic education would be more "appropriate" with than without an interpreter, I must yet consider any negative impact the interpreter would have on her social development. The defendants have contended that the presence of an interpreter would be disruptive and would isolate Amy from her classmates by singling her out as a handicapped child. These assertions are largely based, however, on the testimony of individuals, like Amy's teacher, who have had no experience with interpreters in the classroom— that is, on pure speculation. They are also based to some extent on the observations and recommendations of an interpreter who was placed in Amy's classroom for a two-week trial period in the spring of her kindergarten year. That recommendation, however, which purported to be applicable only to her kindergarten year, is already over a year and a half old. Defendants also invoke the interpreter's report, which describes Amy's refusal to follow him rather than her teacher, in support of the proposition that Amy will not make use of an interpreter's services. There is no indication, however, that Amy was adequately coached to respond to this change in her classroom setting, or that she was given enough time to adjust to it. It is hard for me to believe that a child who has been raised with the use of total communication cannot be taught to follow an interpreter.

One of the plaintiffs' experts, Dr. Donald Moores, who has had experience with interpreters in the classroom, testified that a sensitive interpreter can minimize his disruptive impact on the classroom. In addition, he pointed out that the FM wireless currently used by Amy in class, which operates through a transmitter which the students pass from hand to hand when they are reading aloud, is also potentially disruptive and also draws the attention of other students to Amy's handicap. All of the testimony offered by both sides, however, establishes that Amy's classmates have adapted without difficulty to the presence of the wireless and have accepted Amy as their peer. There is nothing in the record to suggest that they will respond to the presence of an interpreter any differently.

---

10. Defendants also contend that Amy is unique by virtue of her substantial residual hearing and her very good lipreading ability. While that contention is supported by the evidence, it does not appear to have the significance attributed to it by the defendants. Most deaf children have at least some residual hearing, and Amy's is not so great as to affect her classification as deaf. Regardless of her residual hearing and lipreading skills, her ability to discriminate speech is at a 59% level—well below that of normal children. In addition, the plaintiffs' evidence suggests that Amy's skill may be attributed at least in part to her early training using total communication. It is likely then that her skills will continue to develop if total communication is used in the classroom.