**Steven DOE, et al., Plaintiffs,**

v.

**John H. LAWSON, Commissioner of the Massachusetts Department of Education, et al., Defendants.**

**Civ. A. No. 82–3881–MA.**

United States District Court,
D. Massachusetts.

Jan. 19, 1984.

chusetts Bureau of Special Education Appeals (the "Bureau") has approved, calls for the plaintiffs' son Steven to be placed in a program operated by a seven-town special education collaborative called CHARMMS, rather than at the South Shore Center for Brain Injured Children (the "Center"), which Steven has attended for the past seven years. The parents contend that Steven will not receive an "appropriate" education at CHARMMS and, consequently, Holbrook's plan to place him there violates the Act. Under the Act, states that receive funds are required to provide a "free appropriate public education" to all handicapped children. 20 U.S.C. § 1412(1). Pursuant to Fed.R.Civ.P. 52(a), I make the following findings and rulings.

Steven Doe [1] is an 11-year-old boy who suffers from acquired encephalopathy. He is severely retarded. His mental age, as measured on the Bayley Scale of Infant Development, is approximately four months, according to an evaluation conducted in 1981. He is legally blind and has a profound hearing loss. He lives with his parents in Holbrook. Since 1975 Steven has been enrolled in a day program at the Center, at Holbrook's expense and, until 1981, with that Town's approval. He has made some progress in the years that he has been there. He can now sit unassisted, hold his head up, reach out for toys and play at the same time, and hold a spoon and feed himself.

Holbrook first proposed in June, 1981, that Steven be placed in the CHARMMS program at the Town Hill School, rather than at the Center. Steven's parents rejected this plan, and on two days in June and July, 1982, the Bureau heard testimony on the question whether the town's plan to place Steven in the program at CHARMMS would provide an appropriate education to Steven. In a decision issued on August 18, 1982, the Bureau concluded that the CHARMMS program would provide an appropriate education, and approved the plan to change Steven's placement. By com-

Peter B. Finn, Guterman, Horvitz, Rubin & Rubin, Boston, Mass., Glenda Consla, Braintree, Mass., for plaintiffs.

Despena F. Billings, Asst. Atty. Gen., Boston, Mass., Donald N. Freedman, Concannon, Rosenberg & Freedman, Newton Center, Mass., for defendants.

## OPINION

MAZZONE, District Judge.

In this action, brought under the Education for All Handicapped Children Act of 1975 (the "Act"), 20 U.S.C. § 1401, *et seq.*, the parents of a severely handicapped child challenge a proposed change of his educational placement. That change, which the Town of Holbrook proposed and the Massa-

1. The complaint used fictitious names to protect the privacy of Steven and his parents.

plaint filed on December 21, 1982, the parents sought judicial review of the Bureau's decision. The Court heard argument on the matter on January 11, 1984. The evidence consists of the testimony before the Bureau's hearing officer and an affidavit submitted on behalf of the plaintiffs by Elizabeth M. Connors, Director of the Center.

The plaintiffs contend that this Court should overturn the Bureau's decision for two reasons. First, the plaintiffs allege that the decision is incorrect as a matter of law because the staffing of the CHARMMS program where Steven is to be placed does not comply with Massachusetts' certification requirements. Second, Steven's parents argue that the Bureau's decision that the CHARMMS program would provide an appropriate education for Steven was not supported by the evidence. I consider each of these contentions in turn. In so doing, I bear in mind that, although my review of the Bureau's decisions is governed by the preponderance of the evidence standard, 20 U.S.C. § 1415(e), I must give "due weight" to the Bureau's decision, and recognize that the Act's review provisions are not "... an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Board of Education v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982).

### 1. *Does the CHARMMS program meet state certification requirements?*

■ The plaintiffs argue that the Bureau's decision is incorrect as a matter of law because the hearing officer erred in concluding that the staffing levels at CHARMMS met the state requirements. Specifically, they contend that the program in which Steven is to be placed does not employ enough qualified "teachers" within the meaning of that term set out in Massachusetts Department of Education regulations. Mass.Admin.Code Tit. 603 § 502.4(b) provides that:

> In each program the number of children for each teacher shall not exceed eight, and for each teacher with an aide, shall not exceed twelve.

The testimony at the administrative hearing makes clear that the CHARMMS program satisfies this regulation. There is no dispute that Cheryl Mambro, the associate teacher of the class at issue, is a "teacher" within the meaning of the regulation quoted above, as she is state-certified in special needs teaching. *See* Mass.Admin.Code Tit. 603, § 1005.1. The head teacher, Jackie Chados-Kramer, is a licensed practical nurse who is not certified as a special needs teacher. She is a "teacher" within the meaning of the regulations, however, as she benefits from a statutory exception enacted for collaborative employees who remain employed by a collaborative in the same position they held prior to August 8, 1981. 1982 Mass.Act. c. 132, § 2. The CHARMMS class also employs two aides. Therefore, even if Ms. Chados-Kramer were not counted as a "teacher," the class would still meet the requirements of the regulations, since it has only eight (or, counting Steven, nine) students, a qualified teacher, and two aides. Therefore, I conclude that the CHARMMS class where the proposed plan would place Steven meets the staffing requirements called for by state regulations.

### 2. *Is the CHARMMS placement appropriate?*

■ In *Board of Education v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the Supreme Court rejected the contention that Congress' purpose in passing the Act was to require participating states to "maximize the potential of handicapped children 'commensurate with the opportunity provided to other children.'" *Id.* at 189–90, 102 S.Ct. at 3042, quoting opinion below, 483 F.Supp. 528 at 534. Instead, the Court held that the Act was intended simply to provide a "basic floor or opportunity" to handicapped children, requiring participating states to provide "access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id.* 458 U.S. at 201, 102 S.Ct. at 3048. Still, the court held that it is not enough that the state provide some *servic-*

*es;* the Act requires that the state provide that level of educational services sufficient to confer some educational *benefit* on the handicapped child. *Id.* at 200, 102 S.Ct. at 3047. As the Court noted, "It would do little good for Congress to spend millions of dollars in providing access to a public education only to have the handicapped child receive no benefit from that education." *Id.* at 200-01, 102 S.Ct. at 3047-48. *See also Abrahamson v. Hershman,* 701 F.2d 223 (1st Cir.1983) (Where evidence showed that proposed placement was unlikely to produce educational progress, and was likely to cause some regression, placement could not be made without violating the Act).

In the case at hand, the parents assert that the transfer of Steven from the Center to the CHARMMS program would halt his progress and cause him to regress. In order to evaluate this claim, which, if supported by the evidence, would prevent the proposed transfer, I must compare, in detail, the differences between the Center's program and the CHARMMS program. Before considering those differences, however, it is important to note the respects in which the two programs are similar. The hearing officer found, and the parties do not dispute, that the Center and CHARMMS offer essentially equivalent amounts of conventional physical and vocational therapy. The CHARMMS class, like the Center, has students with disabilities similar in many respects to Steven's: all the students in both classes are profoundly retarded, and all have extremely limited repertoires of skills. While the plaintiffs note that the CHARMMS class has no students who, like Steven, are both legally blind and profoundly deaf, that difference does not, in my judgment, alter the conclusion that the kinds of student each class contains are essentially similar. Both programs are day programs. The Center and CHARMMS each define their students' goals carefully and closely monitor and measure each student's progress.

But there are significant differences between the two programs. The differences lie in two main areas. First, the Center employs a group of "eclectic" techniques—so described by its Program Director, Nancy Waldstein—which are associated with the American Academy for Human Development, of which the Center is a member. CHARMMS does not use these techniques. Second, the student/teacher ratio (with "teacher" broadly defined) is higher at the Center, which permits Steven to experience one-to-one contact with an adult for a significantly higher portion of his day at the Center than he would experience at CHARMMS. In evaluating whether the CHARMMS program is adequate for Steven, I must examine the evidence relating to each of these areas of difference in order to determine whether Steven is likely to require any of the services offered at the Center, but not offered at CHARMMS, in order to make educational progress.

### A. *The Academy for Human Development Techniques.*

The primary difference between the Center's approach to teaching and the program offered by CHARMMS is the use, at the Center, of a group of five techniques: patterning, masking, vestibular stimulation, contrast baths, and the Van Dijk Communication Program. The patterning exercise is performed on each child four times a day for five minutes at a time. It may require as many as three adults for each child. The adults manipulate the child's head and limbs to approximate the motions of creeping and crawling. After the patterning exercise is completed, the child is placed on the floor, on a slide, or in a special "crawl box" where he is encouraged to practice the techniques of creeping and crawling independently. The patterning exercise is predicated on the theory that:

> there is a certain sequence of neurological events which each individual must go through to achieve his maximum potential.... It is putting a child through the motions that a normal child goes through in crawling, creeping, and walking, in the hopes that healthy brain cells will take the place of damaged ones and learn the movements.

*Plaintiffs' Exhibit J; Letter from Nancy Waldstein dated November 9, 1981.* As the Center's manual for volunteers explains: "By moving the child's arms and legs through movements of crawling, we are in effect saying: 'Brain, this is how it feels to crawl.'" *Affidavit of Elizabeth M. Connors.*

The masking procedure is performed for one minute once each hour. A small mask is placed over the child's nose and mouth. A hole in the mask permits a limited supply of oxygen to enter the mask, but the child is forced to rebreath air with a high concentration of carbon dioxide. This procedure permits more blood to flow into all the areas of the brain, through the blood vessels which have dilated in response to oxygen deprivation.

Vestibular stimulation is also performed several times each day. The child is placed in a prone or supine position on a board, wearing a seat belt. The board is then spun quickly in one direction, then quickly back in another. The purpose of this exercise is to improve Steven's muscle tone, which is floppy, and improve balance, coordination, and alertness. It is also designed to lengthen Steven's attention span.

Steven is also given contrast baths at the Center. Teachers, aides, or volunteers wash him with a sponge alternately in hot and cold water. The purpose of the baths is to improve Steven's circulation, which is sometimes poor. Ms. Walstein testified that it brings color to his extremities, and is effective for thirty minutes after each bath.

Finally, the Center employs the Van Dijk Communication Program, also called Co-active movement. The child and the adult move closely with one another through a variety of activities, including crawling and rocking. The program is designed to teach severely handicapped children basic communication skills.[2]

Steven's parents contend that Steven will make no progress at CHARMMS, and will in fact regress there, because CHARMMS does not employ the five methods just discussed. This claim would be supported by a preponderance of the evidence in two circumstances. First, if educational experts were to conclude, generally, that the use of the techniques at issue is the proper method of training children with handicaps like Steven's, I would find that an educational program like CHARMMS that did not employ these techniques, was inappropriate. Second, if Steven's progress at the Center could be linked by direct evidence to the use of these techniques, as opposed to the possible use of others, I would also conclude that Steven would be entitled to remain at the Center, since the CHARMMS program would not be appropriate for him. After reviewing the record, however, I must conclude that the preponderance of the evidence does not support the view that a program that does not use these techniques does not provide an appropriate education, either with respect to students with severe handicaps generally, or with respect to Steven in particular.

The plaintiffs have presented testimony demonstrating the value and usefulness of the Academy for Human Development's techniques. In particular, the Center's director, Mrs. Connors, testified in detail by way of affidavit about the effect the Academy's techniques had had on her own children with special needs. The defendant offered evidence which questioned the value of these techniques. The hearing officer offered no conclusion about the efficacy of these techniques, but concluded that the evidence did not support the view that these techniques were the only techniques which would provide educational benefit to severely handicapped children. That conclusion is supported by the evidence of record, which shows that CHARMMS' pro-

---

**2.** Steven's parents also point out a number of other differences between the CHARMMS program and the Center's approach. At the Center, Steven moves more frequently from room-to-room than he would at CHARMMS. The vision therapy is conducted in a separate, darkened room at the Center. The Center uses parent volunteers; CHARMMS does not. Having reviewed the record, I conclude that these differences do not make a placement at CHARMMS inappropriate.

gram, which does not employ those techniques, provides some educational benefit to severely handicapped children.

The record also lacked direct evidence concerning Steven's individual need for these techniques. The testimony offered by the plaintiffs concerning the relationship between their use and Steven's progress was impressionistic, and I agree with the hearing officer's conclusion that the record did not support the view that this program, and this program alone, would provide educational benefit to Steven. Neither does the evidence of record support the view, urged by the plaintiffs, that Steven would regress without the use of the Academy techniques. Finally, in concluding that a program that does not employ the Academy techniques is not for that reason inappropriate, I am mindful of the Supreme Court's instruction that district courts should not make educational policy. The choice between the academy techniques and the techniques used at CHARMMS was a matter of dispute among the special education experts who testified at the hearing. The hearing officer resolved that dispute in favor of the views expressed by the defendants' witnesses, who concluded that an appropriate education could be provided without using patterning, masking, and the other techniques. I give that conclusion the due weight which it deserves. *Board of Education v. Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051.

### 2. *Individual Contact.*

The evidence clearly supports the hearing officer's conclusion that more adults—teachers, aides, and volunteers (many of whom are the students' parents)—are available to work with students at the Center, and, consequently, Steven would receive more individual attention there. There was also evidence, which I credit, pointing to Steven's need for close contact with adults during the course of the school day. Because he is legally blind and profoundly deaf, Steven is aware of the world around him principally through the touch of others, and the more personal contact he has, the more likely he is to make progress in certain areas. In addition, Steven often lapses into self-stimulatory behavior during the periods of the day when he does not have direct contact with an adult. Ms. Waldstein testified that this kind of behavior occurs at the Center during the small portion of each day that Steven does not have direct contact with an adult. Nevertheless, the hearing officer concluded that the evidence did not support the view that Steven would make no educational progress with less frequent contact with adults. I concur in this conclusion. While there seems to be little dispute about the usefulness of one-to-one contact (though one of the defendants' witnesses did suggest that the Center's program employed *too frequent* individual contact), the record does not support the view that the CHARMMS program provides an inadequate amount of individual attention. As the hearing officer concluded, many of the students in the CHARMMS class require rest periods, drug recovery periods, and receive direct training from physical and occupational therapists, freeing the classroom staff for substantial amounts of individual attention for the other students. Therefore, I conclude that the CHARMMS program's relative disadvantage in the area of individualized instruction does not render Steven's placement there inappropriate. Again, the question presented by this action is not whether the CHARMMS program will maximize Steven's potential, or even whether the education provided there is as beneficial to Steven as the Center's program has been. The question I must address is whether the CHARMMS program will provide *some* educational benefit to Steven.

The program that CHARMMS plans to employ involves occupational therapy, physical therapy, task analysis and operant conditioning. The hearing officer concluded that Steven would make progress at CHARMMS. On the evidence before me, I agree. Because the CHARMMS program is likely to provide educational benefit to Steven, I conclude that Holbrook may, consistent with the Act, place him in the CHARMMS program, as that placement provides Steven with an appropriate educa-

tion. Judgment is entered for the defendants.

SO ORDERED.