629 F.2d 269
 Patricia Sue BATTLE, by her parents and next friend June E.
Battle and Donald E. Battle and June E. Battle and Donald E.
Battle in their own right, on behalf of themselves and all
others similarly situated
v.
COMMONWEALTH OF PENNSYLVANIA, Caryl M. Kline, Secretary of
Education, Commonwealth of Pennsylvania,
Department of Education,
The Abington School District, Dr. Carl B. Hoffman,
Superintendent of the Abington School District,
The Woods Schools, Dr. Harold S. Barbour, President of the
Woods Schools.
BERNARD, Natalie, a minor, by her parents and natural
guardians Bernard, Clara M. and Bernard, Robert A.
in their own right, on behalf of
themselves and all others
similarly situated
v.
COMMONWEALTH OF PENNSYLVANIA, Kline, Caryl, Secretary of
Education, Commonwealth of Pennsylvania,
Department of Education,
The Marple Newtown School District, Sanner, Glenn,
Superintendent of the Marple Newtown School District,
Elwyn Institute, Clard, Dr. Gerald R., President of the
Elwyn Institute.
ARMSTRONG, Patricia and John, Individually and on behalf of
their minor child, Gary Armstrong and Norma H., Individually
and on behalf of her minor child, Richard H., on behalf of
themselves and all those similarly situated
v.
KLINE, Caryl, Secretary of Education of the Commonwealth of
Pennsylvania, Individually and in her official capacity,
The School District of Philadelphia, Michael Marcase,
Individually and in his official capacity as
Superintendent of the School District of
Philadelphia and
Arthur W. Thomas, Mrs. Edward Oberholtzer, Augustus Baxter,
Mrs. Lawrence Boonin, Robert Sebastian, Mrs. Michael Stack,
George Philip Stahl, Jr., and Dr. Nicholas Trolio,
Individually and in their official capacities as members of
the Board of Education of the School District of Philadelphia.
 Nos. 79-2158, 79-2188 to 79-2190, and 79-2568 to 79-2570.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 14, 1980.
Decided July 15, 1980.
 
 Allen C. Warshaw, Deputy Atty. Gen., Dept. of Justice (argued), Edward G. Biester, Jr., Norman J. Watkins, John Alzamora, Harrisburg, Pa., for appellants in Nos. 79-2188 and 79-2568-79-2570.
 Janet F. Stotland, Philadelphia, Pa. (argued), for appellees, Armstrong, et al.
 Sylvia Meek, Philadelphia, Pa. (argued), for appellees, Battle and Bernard.
 Michael I. Levin (argued), William Fearen, Cleckner & Fearen, Harrisburg, Pa., for amicus curiae for Pennsylvania School Boards Association.
 Gwendolyn H. Gregory (argued), Thomas A. Shannon, August W. Steinhilber, Washington, D.C., Richard S. Cohen, Waldemar G. Buschmann, Augusta, Me., for amicus curiae for State of Maine and National School Boards Association.
 Frank D. Allen (argued), Joan Z. Bernstein, Ann Marie Reilly, Drew S. Days, III, Peter F. Vaira, Brian K. Landsberg, Washington, D.C., for amicus curiae for United States of America.
 Roger A. Akin, Wilmington, Del., for amici curiae for the State of Delaware and Board of Education, State of Delaware.
 Robert T. Lear, Legal Department, Philadelphia, Pa., for School District of Philadelphia.
 Eleanore O'N. Kolodner, Robert A. MacDonnell, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for Abington School District.
 Vram Nedurian, Newtown Square, Pa., Lewis B. Beatty, Butler, Beatty, Greer & Johnson, Media, Pa., for Marple Newtown School District.
 Before HUNTER, VAN DUSEN, and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 JAMES HUNTER, III, Circuit Judge.
 
 
 1
 The Education for All Handicapped Children Act, 20 U.S.C. §§ 1401-1420 (1976), requires that every state which elects to receive federal assistance under the Act provide all handicapped children with the right to a "free appropriate public education," id. § 1412, and establishes detailed procedures for implementing that right. Id. § 1415. The Commonwealth of Pennsylvania, a recipient of aid under the Act, has established an administrative policy which sets a limit of 180 days of instruction per year for all children, handicapped or not. We are called upon, in this case of first impression, to examine the scope and purpose of this recent act and to decide whether Pennsylvania's policy and the statute may coexist. We conclude that they may not.
 
 I.
 
 2
 This case is before us on interlocutory appeal from the grant of declaratory and injunctive relief ordered pursuant to a finding by the district court that the 180 day rule deprives the members of the plaintiff class of a free appropriate public education and violates their right to procedural safeguards under the Act. We have jurisdiction under 28 U.S.C. § 1292(a)(1) (1976).
 
 
 3
 The case began as three class actions which were filed in January of 1978 by five handicapped children and their parents. The actions were consolidated for trial on their common injunctive and declaratory issues and the class of "(a) ll handicapped school aged persons in the Commonwealth of Pennsylvania who require or who may require a program of special education and related services in excess of 180 days per year and the parents or guardians of such persons" was certified. Armstrong v. Kline, 476 F.Supp. 583, 586 (E.D.Pa.1979).[1]
 
 
 4
 The plaintiffs sued numerous defendants, including the Commonwealth of Pennsylvania, the Pennsylvania Department of Education, the state Secretary of Education, the local school district in which each named plaintiff resides, and the superintendent of each district. The complaint alleged that policies of the defendants, specifically the Commonwealth's 180 day rule, the school districts' refusal to fund the provision of more than 180 days of educational programming, and the statutory provisions which set an annual ceiling on per student expenditures, Pa.Stat.Ann. tit. 24, §§ 13-1376, 13-1377 (Purdon Supp. 1979-80), violate the Education for All Handicapped Children Act, 20 U.S.C. §§ 1401-1420 (1976), the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1976 & Supp. II 1978), the due process and equal protection clauses of the Constitution, and various state laws. At this stage of the proceeding, however, the district court has only passed upon the validity of the 180 day rule under the Education for All Handicapped Children Act. We shall, therefore address only that question, leaving the other issues to the district court in the first instance.
 
 II.
 
 5
 The Education for All Handicapped Children Act, 20 U.S.C. §§ 1401-1420 (1976), represents an attempt by Congress to assist the states in meeting the burdens imposed upon them by the widespread judicial recognition[2] of the right of handicapped children to a free public education appropriate to their needs. S. Rep. No. 168, 94th Cong., 1st Sess. 6, reprinted in (1975) U.S.Code Cong. & Admin.News, pp. 1425, 1429-33. The Act establishes a program of cooperative federalism which sets requirements which must be complied with in order for states to be eligible to receive financial assistance. A number of these requirements are relevant to the instant case. First, each state seeking assistance must have "in effect a policy that assures all handicapped children the right to a free appropriate public education," 20 U.S.C. § 1412(1) (1976), and must develop a plan which details the policies and procedures which insure the provision of that right. Id. § 1412(2). Each state must also establish the requisite procedural safeguards, id. § 1412(5), and must insure that local educational agencies in the state will establish the individualized educational programs required by the Act, id. § 1412(4). Compliance is enforced by the requirement that the state plan must be submitted to and approved by the Commissioner of Education before the state is entitled to assistance. Id. § 1413.
 
 
 6
 At the center of the controversy in this case is the definition of "free appropriate public education." According to the Act, "free appropriate public education" means
 
 
 7
 special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the state educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the state involved, and (D) are provided in conformity with the individualized educational program required under section 1414(a)(5) of this title.
 
 
 8
 Id. § 1401(18). "Special education" is defined as "specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions." Id. at § 1401(16). "Related services" are those services which "may be required to assist a handicapped child to benefit from special education . . . ." Id. § 1401(17). These include transportation and developmental, corrective, and supportive services such as speech pathology, audiology, recreation, psychological services, certain medical services,[3] physical therapy, occupational therapy, and counseling services. Id.
 
 
 9
 The individualized educational program (IEP) provides the vehicle for giving content to the required "free appropriate public education." The IEP is a
 
 
 10
 written statement for each handicapped child developed in any meeting by a representative of the local educational agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of handicapped children, the teacher, the parents or guardian of such child, and, whenever appropriate, such child, which statement shall include (A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.
 
 
 11
 Id. § 1401(19). The IEP must be reviewed and revised by the local educational agency at least annually. Id. § 1414(a)(5).
 
 
 12
 In order to assure that the IEP is properly formulated to provide a free appropriate public education, the Act prescribes several procedural safeguards. Whenever the local agency proposes to change or refuses to change the identification or evaluation of a child, or the provision of a free appropriate public education to a child, the child's parents or guardian must be notified, and the parents or guardian must be given the opportunity to present complaints about any such matter. Id. § 1415(b)(1). When a complaint is made, the parents or guardian are entitled to an impartial due process hearing, conducted by a hearing examiner unrelated to the local agency involved in the care of the child, or by the state educational agency. Id. § 1415(b) (2). If the hearing is conducted by a hearing examiner, any aggrieved party may appeal to the state educational agency. Id. § 1415(c).[4] Any party aggrieved by the decision of the state agency has a right to appeal to a state court of competent jurisdiction or to a district court of the United States. Id. § 1415(e)(2).
 
 III.
 
 13
 The facts found by the district court are not disputed on appeal. Since District Judge Newcomer's opinion, reported below as Armstrong v. Kline, 476 F.Supp. 583 (E.D.Pa.1979), sets forth these facts in detail, we shall content ourselves with a review of only those necessary to our decision.
 
 
 14
 A. Education of the Handicapped in Pennsylvania.
 
 
 15
 The Pennsylvania Department of Education (DOE) is the agency charged with the responsibility of providing education to handicapped children in compliance with the Act. Pursuant to the Act, the DOE requires local school districts to prepare an annual individualized educational program (IEP) for each handicapped child. The program is developed subsequent to an evaluation by educators and medical personnel by a multidisciplinary team familiar with the child. The IEP evaluates the child's current level of ability, establishes the child's program and placement, and sets long and short term educational goals. After it is formulated, the parents or guardian of the child are permitted to review and comment on the IEP. Although they comply with these procedures, the districts that are defendants in this action refuse to provide or fund more than 180 days per year of education for any child. Id. at 586-87.
 
 
 16
 If the parents are unsatisfied with any aspect of their child's classification, placement or program, as established in the IEP, they are entitled to an appeal to an impartial hearing examiner. The hearing examiner is appointed by the DOE and may not be an employee of the district or intermediate unit[5] from which the case originates. It is, however, the policy and practice of the DOE to refuse to provide or to fund the provision of education in excess of 180 days per year for any child, handicapped or nonhandicapped.[6] In keeping with this policy, the DOE has instructed hearing examiners that they are "without authority to, and may not, order a special education program which is in excess of 180 days per year." Id. at 587.
 
 
 17
 B. The Plaintiff Class.
 
 
 18
 Although the plaintiff class has been broadly defined, the district court classified the handicapped children involved into two general groups: the severely and profoundly impaired by mental retardation alone or, as is frequently the case, combined with other impediments; and the severely emotionally disturbed. These conditions vary greatly from child to child and generalization is difficult and may suggest seductively simple solutions. However, it is necessary briefly to attempt to describe the salient characteristics of these children.
 
 
 19
 The Severely and Profoundly Impaired (SPI) are generally regarded as children whose I.Q. is below 30. The severely retarded
 
 
 20
 are likely to be physically handicapped and have difficulty moving. They may enter the school system without toilet training and lack many basic self-held skills, such as dressing and feeding. Their language deficit is usually significant. Academically, one expects their achievements to be very limited, although they may be able to count, tell time and identify a few words on sight at the completion of their education.
 
 
 21
 Id. at 588. The profoundly retarded are the next and lowest subgroup. A profoundly retarded child is unlikely to possess any vocabulary or to be ambulatory. Communication is typically limited to gesturing. Id. SPI children tend to learn much more slowly than nonhandicapped children and tend much more quickly to forget what they have learned. Additionally, SPI children tend to have great difficulty generalizing skills they have leaned from one environment to another. Id.
 
 
 22
 Severely Emotionally Disturbed (SED) children suffer from a wide variety of disturbances including autism, characterized by an inability to relate to and communicate with others, symbiosis, marked by an inseparable relationship with one other person, and schizophrenia which is characterized by strange relationships with other individuals and an inability to cope with reality.[7] Id. at 589-90. SED children frequently exhibit bizarre behavior and are typically unable to accept changes of routine or environment or to deal with frustration. Id. These characteristics, combined with the inability of SED children to exercise self-control, frequently affect their learning capabilities in much the same way as the abilities of SPI children are affected. Thus, they have difficulty leaning new skills and have difficulty generalizing skills. SED children also frequently enter the educational system lacking in many basic self help skills. Id.
 
 
 23
 The educational programs of SPI and SED children depend on the individual abilities of each child. Where basic self help and social skills such as toilet training, dressing, feeding, and communication are lacking, formal education begins at that point. If the child masters these fundamentals, the education moves on to more difficult but still very basic language, social, and arithmetic skills, such as counting, making change, and identifying simple words. In addition, SED children typically require professional assistance in handling their emotional disturbances. Id. at 591.
 
 
 24
 The modest objectives of the educational programs of SPI and SED children are related to each child's potential and typically include "acquiring additional self help skills, avoiding institutionalization or attaining that level of independence with regard to self care that he or she can live in a community living arrangement or at home and work in a sheltered workshop." Id. at 590. For some, but not all, SPI and SED children, standing in the way of the attainment of some of these objectives is the effect of breaks in the educational program which are created, at least in part, by the 180 day rule. The district court found that "as a result of programming interruptions some SPI children lose a large amount of skills and development . . . ." Id. at 593. A similar regression of skill development is found among SED children who also experience a decline in emotional development. Although this regression also occurs in nonhandicapped children, the effect is significantly greater among many SPI and SED children. Id. at 595. The district court rejected the defendants' claims that factors other than programming breaks, including teacher incompetency, parental failure and the lack of functionality of the skills taught, were the cause of regression, finding instead that all factors contribute.
 
 
 25
 Most importantly, the time required to recoup these lost skills, although it varies significantly from child to child, is usually much greater than the time required by the nonhandicapped.
 
 
 26
 Some SPI and SED children return to their pre-break level in a period as short as two weeks, even when they have lost a significant amount of their skills, and then there are other children for whom the process will be long and arduous, consuming sometimes in excess of nine months. Other SPI and SED children will take a month or two months to return to their former level.
 
 
 27
 Id. at 597. Normal children, on the other hand, typically recoup losses within a few weeks and almost never require more than one month. The district court concluded that "interruptions in programming, because of regression and the length of time it takes to regain lost skills and behaviors, render it impossible or unlikely that they will attain that state of self-sufficiency that they could otherwise reasonably be expected to reach." Id.[8]
 
 
 28
 C. The District Court's Resolution of the Problem.
 
 
 29
 The district court, faced with the difficult question of the validity of the 180 day rule, perceived the issue as defining the parameters of a "free appropriate public education." This analysis began with the definition of special education, one of the ingredients of a free appropriate public education. Id. at 603. The court specifically examined the requirement that special education be designed "to meet the unique needs" of the handicapped child. The court, however, recognized that "(n)eeds arise in (the) context of achieving certain ends, and surely there are certain ends, and not others, that are the concern of this legislation." Id. From this perceptive conclusion, the court sought to discern the educational goals intended by the statute to be attained by the plaintiff class. Finding no guidance in the Act itself, the court turned to the legislative history. There, the district court found language to support its conclusion that "(t)he congressional intent was to provide for that education which would leave these children, upon school's completion, as independent as possible from dependency on others, including the state, within the limits of the handicapping condition." Id. at 604. Based on this legal conclusion, and its finding that the 180 day rule precluded these children from attaining that degree of self-sufficiency which they could otherwise (i.e., without the 180 day rule) reach, the district court invalidated the 180 day rule.
 
 IV.
 
 30
 The core of this case is the conflict between the 180 day rule and the statutory mandate of "free appropriate public education." The district court concluded that the Act provides a specific educational goal for members of the plaintiff class. We believe that by focusing on the Act as providing a particular educational goal, the district court erred. Rather, the Act contemplates that in the first instance each state shall have the responsibility of setting individual educational goals and reasonable means to attain those goals. The Act, however, imposes strict procedural requirements to insure the proper formulation of a free appropriate public education. We conclude that the 180 day rule precludes the proper determination of the content of a free appropriate public education and, accordingly, that it violates the Act.
 
 
 31
 To reach this conclusion, we must necessarily interpret the Act's requirement of a free appropriate public education. Unfortunately, the Act provides only limited guidance. First, free appropriate public education must meet the standards of the state educational agency. 20 U.S.C. § 1401(18)(B) (1976). Second, it must be provided in conformity with an individualized education program. Id. § 1401(18)(D). Finally, the Act requires that special education, which is a component of "free appropriate public education," meet the unique needs of the handicapped child. Id. § 1401(16). We find nothing in the Act or regulations promulgated thereunder which further amplifies these provisions so as to provide a clear solution to the conflict in this case. See generally Rowley v. Board of Educ., 483 F.Supp. 528, 533 (S.D.N.Y.1980).
 
 
 32
 The requirement that a free appropriate public education meet the unique needs of the child raises the most difficult question. As the district court properly recognized, needs are necessarily determined in reference to goals. 476 F.Supp. at 603. The only reason a child needs certain programming is to accomplish certain educational objectives. If those objectives are removed, these needs cease to exist.[9] We must, therefore, decide how the Act contemplates that appropriate educational goals are to be determined.
 
 
 33
 The first possibility, of course, is that the Act itself mandates specific educational goals. Here, again, however, we find little assistance. In requiring that education programs for handicapped children meet the child's unique needs, the Act appears to focus on those needs which derive from the difference between the handicapped child and the normal child. Thus, the Act probably anticipates that, where possible, educational objectives for the handicapped should be set with reference to those objectives established for the nonhandicapped. See Rowley v. Board of Educ., 483 F.Supp. at 533; Note, Enforcing the Right to an "Appropriate" Education: The Education for All Handicapped Children Act of 1975, 92 Harv.L.Rev. 1103, 1125-27 (1979) (hereinafter cited as Harvard Note); Cf. 45 C.F.R. § 84.33(b) (1979) (defining "appropriate education" under the Rehabilitation Act of 1976, 29 U.S.C. § 794 (1976 & Supp. II 1978).[10] So, for example, a blind or deaf child may be expected to attain educational achievements commensurate with normal children upon the provision of special services, such as braille books or a sign language interpreter. See generally Rowley v. Board of Educ., 483 F.Supp. 528 (S.D.N.Y.1980).
 
 
 34
 However, even where educational objectives may be established with reference to those objectives set for the nonhandicapped, the determination of appropriate educational programming required by the statute raises extremely difficult problems both in selecting the standard for comparison and in making the appropriate comparison. See e.g., Rowley v. Board of Educ., at 534-536; Harvard Note, supra, at 1125-27. Where, as in this case, the handicap in question profoundly affects the child's learning ability, this comparison reaches a level of difficulty, which, in the absence of legislative guidance, approaches the perimeter of judicial competence. See generally Note, The Education of All Handicapped Children Act of 1975, 10 U.Mich.J.L.Ref. 110, 130-35 (1976) (hereinafter cited as Michigan Note). As the Supreme Court stated in San Antonio School Dist. v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973),
 
 
 35
 (T)his case also involves the most persistent and difficult questions of educational policy, another area in which this Court's lack of specialized knowledge and experience counsels against premature interference with the informed judgments made at the state and local levels. Education, perhaps even more than welfare assistance, presents a myriad of "intractable economic, social, and even philosophical problems."
 
 
 36
 Id. at 42, 93 S.Ct. at 1301 (quoting Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970)). See McInnis v. Shapiro, 293 F.Supp. 327, 335-36 (N.D.Ill.1968).
 
 
 37
 We believe, however, that in cases such as this, the Act did not contemplate a judiciary left to flounder in uncertain educational waters. Traditionally, decisions of educational policy and control over the educational system have been vested in state and local authorities. See Milliken v. Bradley, 418 U.S. 717, 741-42, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); San Antonio School Dist. v. Rodriguez, 411 U.S. 1, 42-43, 49-50, 93 S.Ct. 1278, 1301-1302, 1304-1305, 36 L.Ed.2d 19 (1973); Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968); Harvard Note, supra, at 1109. As the Supreme Court said
 
 
 38
 No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to the quality of the educational process. Thus in San Antonio School District v. Rodriguez, we observed that local control over the educational process affords citizens an opportunity to participate in decisionmaking, permits the structuring of school programs to fit local needs, and encourages "experimentation, innovation and a healthy competition for educational excellence."
 
 
 39
 Milliken v. Bradley, 418 U.S. at 741-42, 94 S.Ct. at 3125.
 
 
 40
 Moreover, the decision to establish certain educational objectives for handicapped children profoundly impacts on the allocation of scarce educational resources. It is beyond dispute that although an educational system ideally should provide the opportunity for its students to develop to their fullest potential, even the best systems are incapable of achieving this goal. See Rowley v. Board of Educ., 483 F.Supp. at 534; Harvard Note, supra, at 1125. In passing the Act, Congress certainly recognized the importance of this problem. The Senate Report quotes with approval Mills v. Board of Educ., 348 F.Supp. 866, 876 (D.D.C.1972), which states
 
 
 41
 If sufficient funds are not available to finance all of the services and programs that are needed and desirable in the system then the available funds must be expended equitably in such a manner that no child is entirely excluded from a publicly supported education consistent with his needs and ability to benefit therefrom. The inadequacies of the District of Columbia Public School System whether occasioned by insufficient funding or administrative inefficiency, certainly cannot be permitted to bear more heavily on the "exceptional" or handicapped child than on the normal child.
 
 
 42
 We believe that these hard decisions of resource allocation, like the determinations of educational policy are best left to the states, in the first instance. Cf. Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970) (Constitution does not empower second guessing on resource allocation). See generally Michigan Note, supra, at 125-28.
 
 
 43
 These policies have been incorporated into the Act. It is most apparent in the requirement that a free appropriate public education meet the standards of the state educational agency. 20 U.S.C. § 1401(18)(B) (1976). Moreover, the Act clearly places ultimate responsibility for compliance with the Act upon the state educational agency. Id. § 1412(b). Perhaps more important is the structure of substantive educational decisionmaking established by the Act. The core of educational programming under the Act is the individualized educational program. See Id. § 1414(a)(5). Although the procedure established for formulation of these IEPs requires parental input, there is little doubt that the final decision rests with the local educational agency, a subdivision of the state. This fact is reflected in both the Pennsylvania procedures, which appear to limit parental input to post hoc commentary, and in the statutory appeal procedure which grants a right only to the parents to complain about the IEP, in contrast with the right to appeal decisions of the hearing examiner, which is granted to both the state and to the parents. Compare id. § 1415(b) with id. § 1415(c). We conclude, therefore, that the Act contemplates that the determination of appropriate educational goals, as well as the method of best achieving those goals, are matters which are to be established in the first instance by the states.
 
 
 44
 The district court, relying on the legislative history of the Act, determined that Congress viewed the attainment of self-sufficiency as a goal of the Act. From this, the district court concluded that the Act imposed specific substantive educational requirements on the states. Although the district court was correct in noting a congressional concern with increased self-sufficiency, we find nothing in the legislative history to overcome our conclusion that the states are free, in the first instance, to establish specific educational goals.
 
 
 45
 The concern for increased self-sufficiency is reflected in the Senate Report to the Act, which states
 
 
 46
 With proper education services, many would be able to become productive citizens, contributing to society instead of being forced to remain burdens. Others, through such services, would increase their independence, thus reducing their dependence on society.
 
 
 47
 S.Rep.No. 168, 94th Cong., 1st Sess., reprinted in (1975) U.S.Code Cong. & Admin.News, pp. 1425, 1433 (hereinafter cited as Senate Report). These concerns also appear in the congressional debates about the bill. See, e. g., 121 Cong.Rec. 19492 (1975) (Senate debate); id. at 25541 (1975) (House debate). These statements, however, do not purport to define the content of "appropriate education" or to articulate specific educational goals.
 
 
 48
 In addition, Congress recognized the need for equal educational opportunity for the handicapped. The statutory statement of purpose states "it is in the national interest that the Federal Government assist State and local efforts to provide programs to meet the needs of handicapped children in order to assure equal protection of the law." Pub.L.No. 91-230, § 601, Stat. (1970), as amended by Pub.L.No. 94-142, § 3(a), Stat. (1975). The Senate Report states "(i)t is this Committee's belief that the Congress must take a more active role under its responsibility for equal protection of the laws to guarantee that handicapped children are provided equal educational opportunity." Senate Report, supra, (1975) U.S.Code Cong. & Ad.News at 1433.
 
 
 49
 Certainly all of this language, including that which expresses a concern for increased self-sufficiency, should provide guidance in the formulation of educational goals.[11] We believe, however, that the district court was premature in attempting to formulate educational policy from the legislative history in the face of the Act's deference to state educational decisionmaking.
 
 
 50
 Having concluded that the states are responsible in the first instance for setting reasonable educational objectives and reasonable means to achieve those objectives, it falls upon us to determine if the Act restricts the states in these determinations. We believe that it does. First, the Act provides for pervasive federal oversight by the Commissioner of Education. Second, the Act sets forth explicitly detailed procedures to assure that the states will properly exercise their responsibility to provide "free appropriate public education." We now consider whether by imposing the 180 day rule the Commonwealth of Pennsylvania comes into conflict with these provisions of the Act.
 
 V.
 
 51
 At the core of the Act is a detailed procedure for determining the contours of the free appropriate public education to be delivered to each child. 20 U.S.C. § 1415 (1976); see Lora v. Board of Educ., 456 F.Supp. 1211, 1227 (E.D.N.Y.1978). See generally Harvard Note, supra, at 1108-13; Michigan Note, supra, at 137-51. We believe that these procedural safeguards require individual attention to the needs of each handicapped child. See Lora v. Board of Educ., 456 F.Supp. at 1226 (clear national commitment to meet each child's special needs in a complete and integrated way); Michigan Note, supra, at 123. The strongest statement of this requirement is the statutory mandate of individualized educational programs. The IEP is the statutory vehicle for formulating the educational objectives and the educational program for each child. We consider it most persuasive that at this fundamental point in the educational decisionmaking process, the statute requires consideration of each individual child. Nor do the later procedures required by the Act depart from this emphasis. The appeal prescribed by the Act is an appeal from the decisions reflected in IEP. See 20 U.S.C. § 1415(b)(2) (1976). Moreover, as difficult as it is to define the scope of the "unique needs" which must be met by special education, see id. § 1401(16), there can be little doubt that by requiring attention to "unique needs," the Act demands that special education be tailored to the individual.
 
 
 52
 This emphasis on the individual is necessary in light of the wide variety of the handicapping conditions covered by the Act. The Act explicitly includes the following children within the meaning of "handicapped children"
 
 
 53
 mentally retarded, hard of hearing, deaf, speech impaired, visually handicapped, seriously emotionally disturbed, orthopedically impaired, or other health impaired children, or children with specific learning disabilities, who by reason thereof require special education and related services.
 
 
 54
 Id. § 1401(1).[12] Indeed, even within the limited conditions which characterize the plaintiff class there is a wide divergence of educational characteristics. This divergence is reflected in the findings of the district court which note the variance among members of the plaintiff class in their degree of impairment, 476 F.Supp. at 588-90, their recovery time from regression, id. at 596-97, and the ability of their parents to provide programming, id. at 594-95.
 
 
 55
 We believe the inflexibility of the defendants' policy of refusing to provide more than 180 days of education to be incompatible with the Act's emphasis on the individual. Rather than ascertaining the reasonable educational needs of each child in light of reasonable educational goals, and establishing a reasonable program to attain those goals, the 180 day rule imposes with rigid certainty a program restriction which may be wholly inappropriate to the child's educational objectives. This, the Act will not permit.
 
 
 56
 To be sure, the Act contemplates that reasonable educational standards may be set by the states. See 20 U.S.C. § 1401(18)(B) (1976) (definition of "free appropriate public education"); id. § 1412(2)(B) (development of state plan detailing policies and procedures). We believe, however, that these standards must allow for individual consideration of each handicapped child.
 
 
 57
 Moreover, in promulgating these standards, the Act contemplates review and approval by the Commissioner of Education, id. § 1413(c), as well as procedural safeguards including public notice and comment, id. § 1412(7)(B). In this way the Act assures that any state standard will be filtered through both the state educational agency, with its expertise and sensitivity to both educational and fiscal matters, the Commissioner of Education, with his expertise, and the general public. Where an inflexible rule has not been afforded this consideration it certainly must fall.[13]
 
 
 58
 We recognize that by this decision we may merely be postponing the inevitable. The statute provides for federal and state judicial review of individual educational programs which have been appealed through the statutory procedure. Id. § 1415(e)(2). Thus it is quite possible that, in the future, we will be called upon to evaluate the substantive content of educational programs developed under the Act. We are hopeful, however, that prior to that day the states, in cooperation with the Commissioner of Education will establish acceptable guidelines to aid in that most difficult decision. Until we are presented with that case, however, "this (c)ourt's lack of specialized knowledge and experience counsels against premature interference" with educational policy decisions. San Antonio School Dist., 411 U.S. at 93, 93 S.Ct. at 1327.
 
 
 59
 We therefore conclude that inflexible application of a 180 day maximum prevents the proper formulation of appropriate educational goals for individual members of the plaintiff class. Because our reasoning differs from that of the district court, some of its orders may require modification. However, because of the multiplicity of factors involved, we believe these modifications are best undertaken by the district court on motion of the parties. In the interim, these orders will remain in force. The case will be remanded to the district court for further proceedings consistent with this opinion.
 
 
 60
 VAN DUSEN, Circuit Judge, concurring.
 
 
 61
 I agree with Judge Hunter's opinion that under the Education For All Handicapped Children Act, 20 U.S.C. §§ 1401-1420 (1976), it is up to the states, not Congress, to establish educational goals for handicapped children. I agree also that the inflexible application of a 180-day maximum in every instance, regardless of the needs of the child or the resources available, violates the Act by preventing the proper formulation of appropriate educational goals for individual members of the plaintiff class. I write separately, however, to emphasize what I perceive to be the limited nature of our holding in this case. I believe that the class before us is narrow in scope, and that the Act, while placing numerous requirements on recipients of federal funds, makes accommodation for legitimate financial concerns of the states.
 
 
 62
 The district court stated that the plaintiff class consisted of "(a)ll handicapped school age persons in the Commonwealth of Pennsylvania who require or may require a program of special education and related services in excess of 180 days per year . . . ." Armstrong v. Kline, 476 F.Supp. 583, 586 (E.D.Pa.1979). Standing alone, this definition is incomplete. It essentially states that those who are entitled to relief are those who require relief. It does not describe the nature of the handicaps of individuals who "require" programs in excess of 180 days per year.[1] The district court did amplify this definition somewhat, however. The court described at length the characteristics of the five named plaintiffs who had been denied education in excess of 180 days per year, and concluded that they, as well as the other children in the class, fall into two categories: severely and profoundly impaired by mental retardation with other handicaps (SPI) and severely emotionally disturbed (SED). Id. at 588. The court reviewed the evidence concerning the effects of interruptions in educational programming on children in these categories, and found that some SPI and SED children, including the named plaintiffs, suffer significant setbacks when there are breaks in their educational programming. Id. at 597. Upon examination of the findings of the trial court with respect to the serious regression in skills experienced by the named plaintiffs and the difficulty with which they recoup those skills after programming interruptions, id. at 593-96, I think it is fair to refine the description of the class as follows: those school age individuals who are severely emotionally disturbed or severely and profoundly impaired and whose regression-recoupment syndrome is so severe that the traditional summer vacation period occasioned by the 180-day policy brings their overall progress for the year to a virtual standstill. I believe this characterization of the class is fair.[2] Counsel for plaintiffs describes the class similarly:
 
 
 63
 "(T)he Court found that plaintiffs, because of the nature and severity of their handicapping conditions, require educational programs which are not only different from those provided to non-handicapped children, but different from those needed by most handicapped children.
 
 
 64
 "(P)laintiffs' unique learning characteristics, together with the defendants' 180 day rule, result in a never ending cycle of progress, interruption in programming, and regression, causing at best severely limited educational progress, and at worse, permanent and irreversible harm."
 
 
 65
 Brief of Appellees Armstrong at 25. Thus, it is with regard to this group of handicapped children that the standard 180-day policy may not be applied. Based on the voluminous evidence presented in this case, the plaintiffs in effect have established a presumption that SED and SPI children with severe regression-recoupment problems require more than 180 days of programming per year.[3]
 
 
 66
 Further, in my view, our decision today prescribes an approach that recipients of funds from the Education For All Handicapped Children Act should take. Under the Act, the state educational authorities must treat handicapped children individually and must set specific educational goals. This translates, I believe, into a prohibition against the application of a rigid 180-day policy when devising individual plans. Thus, the state education specialists must first attempt to plan adequate programs to meet the needs of individual handicapped children without regard to an inflexible 180-day limit,[4] and then must attempt to fund the programs to the maximum extent feasible. If, thereafter, the state administrators are in some instances unable due to budgetary restraints to furnish the full programs they have devised for each individual, such program cutbacks imposed by legitimate funding limitations will not in themselves place the educational authorities in noncompliance with the statute.[5]
 
 
 67
 In summary, I believe we must take a pragmatic view of the problem presented to us by the Education For All Handicapped Children Act. We must enforce the provisions of the Act by invalidating here the defendants' inflexible application of a 180-day maximum policy, but we must also acknowledge that the defendants do not have unlimited resources. With these factors in mind, I concur in the remand and the judgment of the court.
 
 
 68
 SLOVITER, Circuit Judge, concurring and dissenting in part.
 
 
 69
 In enacting the Education For All Handicapped Children Act, 20 U.S.C. § 1401 et seq. (1976), Congress has undertaken to provide federal assistance to the states in order that handicapped children, defined as those who are mentally retarded, learning disabled, physically handicapped, and emotionally disturbed, id. § 1401(1), will be able to receive a free public education appropriate to their needs. The statute imposes the following three principal obligations on states which choose to participate: (1) It requires that each participating state must have "in effect a policy that assures all handicapped children the right to a free appropriate public education," id. § 1412(1); (2) It requires that each state must establish fair procedures designed to effectuate the individualized attention to which each handicapped child is entitled. These include establishment of an individualized educational program (IEP) for each child, and notice and an opportunity to be heard with respect to that IEP and any changes regarding it, id. §§ 1401(19), 1412(4), 1414(a)(5), 1415(a)-(d); and (3) It requires that each state must develop a plan which sets forth in detail the policies and procedures which the state will undertake to assure, inter alia, that there is established "a goal of providing full educational opportunity to all handicapped children." Id. § 1412(2)(A).
 
 
 70
 Judge Newcomer made findings of fact, including those regarding the learning regression of members of the plaintiff class, which have not been disputed on appeal. After considering these facts, the language of the statute, and its history, he held that Pennsylvania's policy which limits the instruction available to handicapped children to 180 days a year
 
 
 71
 precludes plaintiffs and those similarly situated from receiving an education that is likely to allow them to reach their reasonably set educational goals with respect to self-sufficiency, whether that be merely avoiding institutionalization or living in a community living arrangement and working in a sheltered workshop.
 
 
 72
 Armstrong v. Kline, 476 F.Supp. 583, 600 (E.D.Pa.1979).
 
 
 73
 The majority agrees that Pennsylvania's "inflexible application of a 180 day maximum prevents the proper formulation of appropriate educational goals for individual members of the plaintiff class." At 281. It appears to reach this conclusion on the basis that the Pennsylvania rule violates the procedural requirements which the Act imposes, because the rule applies across the board without regard to the individual child. I agree with the majority in this conclusion. However, the majority declines to affirm the district court judgment in its entirety because "the district court was premature in attempting to formulate educational policy from the legislative history in the face of the Act's deference to state educational decision making." At 279. I respectfully dissent from this portion of the majority's decision because I believe that elucidation of the principal goal of the statute is essential to any interpretation of its provisions, whether they are substantive or procedural.
 
 
 74
 The rationale given by the majority for declining to attempt some definition of the statutory goal of a "free appropriate public education" is twofold. It would defer to the states in this regard because, first, "(t)raditionally, decisions of educational policy and control over the educational system have been vested in state and local authorities", at 277; and, second, "hard decisions of resource allocation, like the determinations of educational policy are best left to the states, in the first instance." At 278 (emphasis added).
 
 
 75
 These reasons confuse explication of the ultimate goal, which Congress articulated but unfortunately failed to define when it enacted the statute, and the appropriate implementation of that goal, which Congress left to determination by the states. I agree with both of my colleagues that the contours of the state's program must be defined by the state. It is the state which must determine which specific programs should be offered, how those programs must be structured, and how the delicate and intricate balancing of funds and resources between handicapped and nonhandicapped children must be managed. In the process, different states may establish somewhat varying mediate goals as steps toward realization of the federal policy.
 
 
 76
 On the other hand, the ultimate goal of the statute was already set by Congress when it legislated the specific goal of a "free appropriate public education" and required the states to adopt that policy. The states are not free to develop any different policy or modify that set by Congress. Therefore, there is no reason to defer to the states for a definition of the Congressionally established policy. The usual reasons for deference, familiarity with local conditions and local resources, warrant deference to the state in the manner in which the policy should be implemented but are inapposite when the issue is the meaning of the statutory policy. Although the majority does not expressly so state, its deferral to state definition suggests that each state may define the statutory goal differently. But the statute manifests a considered judgment by Congress as to the needs of the handicapped children of the entire country. Those needs may not be adequately met if the local programs are measured against a statutory goal which is permitted to vary with the happenstance of the state in which the child lives. There is nothing in the statute which would warrant anything other than a uniformly applicable interpretation of the nationally prescribed goal of a "free appropriate education."
 
 
 77
 The majority's reluctance to consider the goal cannot even be supported as a labor-saving device for the federal judiciary. Although the result of its holding is to require that Pennsylvania analyze whether the 180 day rule violates the statutory right of each individual member in the plaintiff class to a "free appropriate education" without any guidance by this court as to what goal that language comprehends, our respite will be only temporary. For, the majority recognizes that, in the last analysis, there must be a federal interpretation of a federal statute. "We recognize that by this decision we may merely be postponing the inevitable. The statute provides for federal and state judicial review of individual educational programs which have been appealed through the statutory procedure. Id. § 1415(e)(2). Thus it is quite possible that, in the future, we will be called upon to evaluate the substantive content of educational programs developed under the Act." Typescript op. at 281. (Emphasis added). Therefore, I believe that since the question is appropriately before us today, we cannot responsibly defer the decision for another day.
 
 
 78
 Turning then to the meaning of the statutory language, "a free appropriate education," the district judge found the reasonable educational objective of the statute to be directed to the goal of achieving self-sufficiency. He concluded "that the unique needs that must be met by the educational program include those that if satisfied, allow the child, within the limits of his or her handicap, to become self-sufficient." 476 F.Supp. at 604.
 
 
 79
 This goal was one that was once acknowledged by the Commonwealth of Pennsylvania in the past, was espoused by the educational experts in this case, including experts representing the Commonwealth, and appears to be the generally accepted educational objective for severely retarded and emotionally disturbed children. Finally, and most importantly, this appears to be the ultimate goal contemplated by Congress when it enacted the statutory scheme.
 
 
 80
 In Pennsylvania Association for Retarded Children (P.A.R.C.) v. Commonwealth of Pennsylvania, 334 F.Supp. 1257 (E.D.Pa.1971) (three-judge court) (per curiam), plaintiffs challenged Pennsylvania's policy which excluded mentally retarded children from education and training in public schools. They presented testimony from four experts in the field of education of retarded children to prove that the retarded are educable and that denial of such education amounts to a denial of equal protection of the laws. The Commonwealth, soon after presentation of plaintiffs' evidence, entered into a Consent Agreement in which it undertook to provide free public education for all children between the ages of six and twenty-one. In paragraph 4 of the Consent Agreement, the Commonwealth agreed to the objective of providing handicapped children with education aimed at fostering self-sufficiency, the goal about which the Commonwealth now complains:
 
 
 81
 4. Expert testimony in this action indicates that all mentally retarded persons are capable of benefiting from a program of education and training; that the greatest number of retarded persons, given such education and training, are capable of achieving self-sufficiency, and the remaining few, with such education and training, are capable of achieving some degree of self-care . . ..
 
 
 82
 P.A.R.C., 334 F.Supp. at 1259.
 
 
 83
 The Commonwealth's undertaking to educate the handicapped with the goal of fostering self-sufficiency is also reflected in the regulations of the Pennsylvania Department of Education which state that Pennsylvania's educational standards are aimed at "provid(ing) exceptional school-aged persons with quality special education programs and services which will ultimately enable them to participate as fully as possible in appropriate activities of daily living." 22 Pa.Code § 13.2(a). See also Fialkowski v. Shapp, 405 F.Supp. 946, 959 (E.D.Pa.1975) (possible equal protection violation exists if handicapped children do not receive an education equipping them with the "tools needed in life").
 
 
 84
 Significantly, the Commonwealth does not challenge on appeal here Judge Newcomer's finding that the goal of self-sufficiency for SPI and SED children is one generally recognized by educators. The court stated:
 
 
 85
 Generally, educators of the SPI or SED speak of their students' potential in terms of attaining the highest level of self-sufficiency that the child can achieve, whether that be acquiring additional self-help skills, avoiding institutionalization or attaining that level of independence with regard to self care that he or she can live in a community living arrangement or at home and work in a sheltered workshop. Both plaintiffs' and defendants' experts agreed that these generally were the objectives of the education of the SPI and SED.
 
 
 86
 476 F.Supp. at 590 (emphasis added).
 
 
 87
 The Supreme Court has recognized that education is designed to enable students to become self-sufficient. It has commented that "education prepares individuals to be self-reliant and self-sufficient participants in society," Wisconsin v. Yoder, 406 U.S. 205, 221, 92 S.Ct. 1526, 1542, 32 L.Ed.2d 15 (1972), and that "it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954).
 
 
 88
 There are several indications that Congress intended that the special education mandated by the statute should be directed to the achievement of self-sufficiency by the handicapped child to the extent possible within the reasonable limits of resource allocation. The P.A.R.C. Consent Decree which adopted that goal was expressly referred to throughout the legislative history of the statute. S.Rep.No.94-168, 94th Cong., 1st Sess. 1, 6-7. The Senate Report accompanying the statute stated that the intent of Congress was to establish a program which "will result in maximum benefits to handicapped children and their families." Education For All Handicapped Children Act of 1975, S.Rep.No.94-168, 94th Cong., 1st Sess. 1, 6 reprinted in (1975) U.S.Code Cong. & Admin.News 1425, 1430. The Report referred to the need to increase independence of the handicapped and to end their needless institutionalization. Id. at 7-9, 1975 U.S.Code Cong. & Admin.News at 1431-33.
 
 
 89
 Defendants claim that no child is entitled to a goal of maximization as part of his or her education. They argue that the statute requires merely assurance of an equal educational opportunity for the handicapped. The district court recognized that the state was not required to "provide a program which is designed to allow each handicapped child to reach his or her maximum potential in every respect." 476 F.Supp. at 604.
 
 
 90
 Rather, it is limited to those areas with which Congress expressed concern. The congressional intent was to provide for that education which would leave these children, upon school's completion, as independent as possible from dependency on others, including the state, within the limits of the handicapping condition.
 
 
 91
 Id.
 
 
 92
 Provision of an equal number of school days or equal resources is obviously not enough to meet the design of the statute because provision of an equal education to handicapped children such as those in the plaintiff class would not satisfy their unique needs. Defendant's argument would read out of the statutory goal the requirement that the education for handicapped children be "appropriate". By use of that word, as well as by the entire statutory structure, it is manifest that Congress was concerned with the qualitative nature of the education to be provided.
 
 
 93
 The statutory goal to provide a "free appropriate education" must be viewed as one establishing the direction toward which the programs required by the statute should aim. To define that direction for the handicapped as one leading toward self-sufficiency is merely to acknowledge the obvious that the severely and profoundly handicapped children in the plaintiff class do not possess substantial learning capacity along objective academic lines and therefore must be assisted in achieving the realistic educational objective available to them, that of reasonable self-sufficiency under their individual circumstances. Only when that statutory goal is acknowledged can Pennsylvania satisfactorily perform the individual evaluations required by the statute and the majority.
 
 
 94
 The narrow issue before the district court was whether Pennsylvania's rule limiting its annual education to 180 days as applied to the class of handicapped children who seriously regress when there are long interruptions in their education violates the congressional policy of requiring an "appropriate" education for such children. I would affirm the district court's holding that it does. An educational program which ignores the unique learning characteristics of this group of handicapped children denies them a reasonable opportunity to achieve the educational objectives intended by Congress.
 
 
 
 [1]
 Judge Van Dusen would hold this definition of the plaintiff class to be incomplete and would redefine the class as
 those school aged individuals who are severely emotionally disturbed or severely and profoundly impaired and whose regression-recoupment syndrome is so severe that the traditional summer vacation period occasioned by the 180 day policy brings their overall progress for the year to a virtual standstill.
 Concurring op. at 282. Judge Van Dusen is correct in noting that the original definition of the class in terms of those who "require" more than 180 days of education, is somewhat incomplete on its face. However, we believe that the content of the class is made clear in the court's opinion and in its orders which apply to those handicapped children whose regression-recoupment syndrome makes it "impossible or unlikely that they will attain that state of self-sufficiency that they could otherwise reasonably be expected to reach" if limited to 180 days of programming. Armstrong v. Kline, 476 F.Supp. 583, 597 (E.D.Pa.1979). See Armstrong v. Kline, No. 78-172 (E.D.Pa., Sept. 5, 1979) (Remedial order No. 2).
 The definition of the class is a matter within the broad discretion of the district court. See Gardner v. Westinghouse Broadcasting Co., 559 F.2d 209, 212 (3d Cir. 1977), aff'd 437 U.S. 478, 98 S.Ct. 2451, 57 L.Ed.2d 364 (1978); cf. Katz v. Carte Blanche Corp., 496 F.2d 747, 757 (3d Cir.) (district court has broad discretion in determining if class action is maintainable), cert. denied, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974); City of New York v. International Pipe & Ceramics Corp., 410 F.2d 295, 298 (2d Cir. 1969) (trial judge given greatest respect and broadest discretion in class action decisions). Where, as in the appeal currently before this court, the class action seeks only injunctive or declaratory relief, for which the notice provision of Fed.R.Civ.P. 23(c)(2) is not mandatory, the district court has even greater freedom in both the timing and specificity of its class definition. See Jimenez v. Weinberger, 523 F.2d 689, 697-98 (7th Cir. 1975), cert. denied, 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1204 (1976); Rice v. City of Philadelphia, 66 F.R.D. 17, 19-20 (E.D.Pa.1974); 3B J. Moore, Moore's Federal Practice § 23.04(l), at 120 (2d ed. 1980). The fact that the district court's class definition was not clarified until the time of judgment, see, e.g., Remedial order No. 2, supra, does not require us to modify that definition. See Johnson v. General Motors Corp., 598 F.2d 432, 434-35 (5th Cir. 1979) (description of class by implication from final decree is sufficient); Jimenez v. Weinberger, 523 F.2d 689, 698-99 (7th Cir. 1975) (class defined concurrent with judgment), cert. denied, 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1204 (1976).
 Moreover, we note that on appeal neither party challenged the district court's class definition in either briefs or argument. Accordingly, in this case, the question of class definition is not properly before us. See Brown v. Sielaff, 474 F.2d 826, 828 (3d Cir. 1973). Accord, Caperton v. Beatrice Pocahontas Coal Co., 585 F.2d 683, 692 (4th Cir. 1978); United States v. Edmonds, 524 F.2d 62, 64 n.11 (D.C.Cir.1975). This is particularly so, since the class definition is not, in any respect, relevant to the theory with which we decide this case.
 
 
 [2]
 The legislative history specifically cites the two seminal cases of Pennsylvania Ass'n for Retarded Children v. Pennsylvania, 334 F.Supp. 1257 (E.D.Pa.1971), modified, 343 F.Supp. 279 (1972), and Mills v. Board of Educ., 348 F.Supp. 866 (D.D.C.1972), which suggest the existence of a constitutional right to free publicly supported education. S. Rep. No. 168, 94th Cong., 1st Sess. 6, reprinted in (1975) U.S.Code Cong. & Admin.News, pp. 1425, 1430. See generally Note, The Education of All Handicapped Children Act of 1975, 10 U.Mich.J.L.Ref. 110, 111-18 (1976)
 
 
 [3]
 "Related services" includes only those medical services necessary for diagnosis and evaluation. Id
 
 
 [4]
 The hearings are to be conducted in accordance with numerous procedural safeguards, including the right to be advised by counsel, confrontation, cross-examination, compulsory process, the right to a verbatim record of the proceedings, and the right to the findings of fact and conclusions of law. Id. § 1415(d)
 
 
 [5]
 An intermediate unit is a
 public authority, other than a local educational agency, which is under the general supervision of a State educational agency, which is established by State law for the purpose of providing free public education on a regional basis, and which provides special education and related services to handicapped children within that State.
 20 U.S.C. § 1401(22) (1976).
 
 
 [6]
 The derivation of this policy is unclear to this court. Although our attention has been called to Pa.Stat.Ann. tit. 24, § 15-1501 (Purdon 1962), that statute establishes 180 as the minimum number of days per year which are permitted, not the maximum
 
 
 [7]
 Federal Regulations define "seriously emotionally disturbed" as follows:
 (i) The term means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree, which adversely affects educational performance:
 (A) An inability to learn which cannot be explained by intellectual, sensory, or health factors:
 (B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers;
 (C) Inappropriate types of behavior or feelings under normal circumstances;
 (D) A general pervasive mood of unhappiness or depression; or
 (E) A tendency to develop physical symptoms or fears associated with personal or school problems.
 (ii) The term includes children who are schizophrenic or autistic. The term does not include children who are socially maladjusted, unless it is determined that they are seriously emotionally disturbed.
 
 
 [45]
 C.F.R. § 12la.5 (1979)
 
 
 [8]
 The court stated that its "ultimate factual finding" was that the 180 day rule "precludes plaintiffs and those similarly situated from receiving an education that is likely to allow them to reach their reasonably set educational goals with respect to self-sufficiency, whether that be merely avoiding institutionalization or living in a community living arrangement and working in a sheltered workshop." Id. at 600. We believe these two findings to be the same in light of the court's conclusion that the "reasonably set educational goal" is, if fact, set by the Act, which requires the educational program to "leave these children, upon school's completion, as independent as possible from dependency on others, including the state, within the limits of the handicapping condition." Id. at 604
 
 
 [9]
 Moreover, in the absence of educational objectives, we do not believe that the fact that class members experience regression during periods without programming and require unusually long periods of time to recover those lost skills creates "unique needs." We can perceive no difference between a child who requires two months to recoup prior learning then acquires a quantum of new skills in the remainder of the school year, and a child who loses little during a break, but is a slower learner, requiring the entire school year to learn the same quantum. Indeed, the findings of the district court indicate that the regression problem of SPI and SED children appears to be but a larger scale version of a phenomenon found in normal children. The significance of the regression problem is little different from the significance of the fact that SPI and SED children learn skills much more slowly than nonhandicapped children. Regression and speed of learning are significant only insofar as they impact on the child's ability to attain specified educational goals. In the absence of such goals, however, they are not relevant
 
 
 [10]
 45 C.F.R. § 84.33(b) provides in relevant part:
 For the purpose of this subpart, the provisions of an appropriate education is the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met. . . .
 
 
 [11]
 While recognizing that the legislative history of the Act reflects an underlying congressional concern with increased self-sufficiency which should guide the states in their formulation of specific educational goals, we refrain from declaring that concern to be "the ultimate goal" of the Act. See Judge Sloviter's concurring and dissenting op. at 284. We think it would be unwise to declare in advance that all educational policies predicated on other reasonably conceived goals are invalid. Each such policy deserves the benefit of a full examination for compliance with the Act by this court, especially in light of a legislative history which we do not believe clearly defines any single ultimate goal. Indeed, Pennsylvania's educational policy was in fact directed at the goal of increased self-sufficiency, so that this case does not even present us with the opportunity to review a policy based upon some other underlying goal
 Moreover, we note in passing that even if we were to view increased self-sufficiency as the ultimate goal of the Act, we would still disagree with Judge Sloviter's conclusion that the district court's orders should be affirmed in their entirety. The district court, by concluding that the Act required the states to "provide for that education which would leave these children . . . as independent as possible from dependency on others . . . within the limits of the handicapping condition," Armstrong v. Kline, 476 F.Supp. 583, 604 (E.D.Pa.1979), effectively established a specific level of achievement for each individual, i.e., maximization of self-sufficiency. This position goes far beyond "establishing the direction toward which the programs required by the statute should aim," Judge Sloviter's concurring and dissenting op. at 286 (emphasis added), and clearly intrudes upon the very core of those issues which are to be left to the states in the first instance, see supra at 277-278. Indeed, Judge Sloviter indicates that she would limit the Act's requirement of the achievement of self-sufficiency to that which is possible "within the reasonable limits of resource allocation." Judge Sloviter's concurring and dissenting op. at 286. This, in itself, would seem incompatible with the district court's finding that the statute requires the maximization of self-sufficiency for each child.
 
 
 [12]
 For an elaboration of these conditions, see 45 C.F.R. § 121a.5 (1979)
 
 
 [13]
 The Commonwealth contends that the Commissioner of Education approved the Pennsylvania plan despite inclusion of the 180 day rule. An affidavit submitted to this court by the Commonwealth, however, belies that contention. The approved plan contains only the statement that funds "will be utilized to support instructional programs during the period required by state law." The Commonwealth contends that this, combined with the statutory minimum of 180 days, Pa.Stat.Ann. tit. 24 § 15-1501 (Purdon 1962), constitutes inclusion of the 180 day maximum in the plan. We disagree. The plan gives no indication that the Commonwealth will refuse to fund programs in excess of the period required by state law. Moreover, the "period required by state law" is an ambiguous term which does not necessarily refer to the 180 day provision. Finally, we note in passing that the Commissioner disagrees with this interpretation of the Pennsylvania plan and, appearing as Amicus, argues strenuously against the 180 day rule
 
 
 [1]
 In its opinion the district court at several points referred to SED and SPI children whose regression-recoupment problem made it "impossible or unlikely that they will attain that state of self-sufficiency that they could otherwise reasonably be expected to reach." Armstrong v. Kline, 476 F.Supp. 583, 597 (E.D.Pa.1979); see id. at 604. It appears to me that this description also is incomplete in defining the boundaries of the class. In this suit the district court reached a legal conclusion that the Act imposed a specific educational goal that of maximizing self-sufficiency for individuals who are handicapped within the meaning of the Act. In effect, the court in this description has identified class members in terms of the ultimate legal conclusion, rather than in terms of the factual attributes which place them in the class. The definition is silent as to the physical and mental characteristics which individuals must possess in order to be class members and entitled to the relief sought
 
 
 [2]
 I disagree with the view that this is a redefinition of the class and raises an issue not properly before us. See majority opinion at 271, note 1. As the majority opinion acknowledges, the class definition articulated by the district judge is incomplete on its face. Thus, I believe, we are forced to describe the class more fully in order that the concerned parties will be able to know who is bound by our decision
 
 
 [3]
 The district court made factual findings, not contested on appeal, that some SPI and SED children do not lose a significant amount of previously acquired skills when their programs are interrupted, Armstrong v. Kline, 476 F.Supp. 583, 593 (E.D.Pa.1979), and that some SPI and SED children "return to their pre-break level in a period as short as two weeks, even when they have lost a significant amount of their skills." Id. at 597. For these children the summer vacation period occasioned by the 180-day policy would not be detrimental. The district court recognized this, and emphasized that the evidence demonstrated that other SPI and SED children experience significant problems with both regression and recoupment. Id
 
 
 [4]
 For example, in preparing an individualized educational program (IEP) for a child who is severely emotionally disturbed and has been identified as one who experiences serious problems with regression and recoupment when his programming is interrupted, it would be presumed that the traditional summer vacation period occasioned by the standard 180-day policy of defendants would be very detrimental to his educational progress. Therefore, his IEP would most likely include programming at certain intervals throughout the summer months, in addition to that planned during the traditional school year. The defendants would be required to attempt to provide all the programming called for by the IEP. If financial restraints prevented defendants from furnishing all the programming outlined in the IEP, certain cutbacks in the IEP would be permissible (such as, for example, reductions from daily programming to programming twice a week during the summer)
 
 
 [5]
 We are aware that insufficient funding may affect programs for the nonhandicapped as well as for the handicapped; the brunt of it cannot be permitted to fall more heavily on the handicapped, however. See Mills v. Board of Educ., 348 F.Supp. 866, 876 (D.D.C.1972)